**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Alan Reider, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Case No.: 07C 7271** |
| ) | **Magistrate Judge: Cox** |
| Michael J. Astrue, ) | |
| ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION**
**FOR SUMMARY JUDGEMENT OR FOR REMAND**

**PROCEDURAL HISTORY**

Plaintiff, Alan Reider, filed his application (R980) for Title II disability benefits on July 5, 2005 alleging an onset date of his disabling impairments of October 29, 2004. His claim was denied by decision dated September 29, 2006 (R186-197) but remanded for supplemental hearing by the Appeal's Council by order dated February 8, 2007 (R215). His claim was again denied by the same ALJ by decision dated June 29, 2007 (R17) and a timely Complaint For Administrative Review was filed. This brief follows.

**SUPPLEMENTAL HEARING TESTIMONY JUNE 5, 2007**

In response to questions posed by the ALJ, Plaintiff testified he no longer drove because he sold his car. Consequently, he would ask someone else to drive for errands and doctors appointments (R261). He had college degrees in biology and chemistry. Past jobs were database administer and lab tech. He could no longer perform these because rest was needed

during the day to keep his pain level under control. Side effects from medications made him drowsy and unable to concentrate. Regarding other jobs, even they required concentration. Assembly line and packing jobs could not be done because he could not sit or stand for a long time, needed to shift positions and required bed rest, who was no longer looking for jobs he could do at home (R263). He last saw Dr. Shapiro in March. He prescribed more pain killers but no additional MRI's or x-rays. A neurosurgeon did not recommend surgery. Although he had 3 steroid injections, Dr. Shapiro did not refer him for any additional physical therapy or injections. Bed rest was recommended. Although medications were helping with depression, without them he would be worse. Dr. Notanka did not recommend any additional treatment or therapy but, since the depression worsened, medications were switched from zoloft to wellbutrin, which provided some improvement. Pain would originate in the lower back, radiate through the buttocks and leg, and then radiate upward when sitting (R265). The shoulders and back would also become stiff. Extending his leg or, even better, laying down to release the pressure. He would switch positions constantly and was unable to stand more than 2 minutes without the pain radiation becoming terrible. Crying spells occurred on and off. He still suffered from apathy. He could walk for 20 to 30 minutes with no problems (R267) but could stand only a couple of minutes, no longer (R267). Pain was aggravated very quickly if he stood, so to relieve it he would constantly move his foot or look for some sort of support. He could sit 20 to 30 minutes but could not sit still, needing to constantly shift positions. He could lift 5 to 10 pounds. During a typical day he would watch TV alot and do some reading. After his girlfriend returned they would eat and sometimes go for a short walk. He no longer read as much as he used to. He traveled to Mexico as indicated in the earlier hearing, during the winter of 2005-2006, and to

Asia in November 2006.  It was a long flight but he was able to sit after taking 2 vicodins (R269).  He was there 3 months because he broke up with his girlfriend and had no other place to stay.  He chose Asia because it was cheap.  While there he would read, watch TV and sometimes go for a walk.  The ALJ was puzzled about why he was able to go to Asia but unable to go down the block or someplace, stating it did not make sense to her.  Plaintiff responded he went there because total monthly expenses were less than $500.00 in Asia (R270).

In response to questions posed by counsel vicodin made him very drowsy, precipitating sleep during the day, on and off, described as sort of spacing out, unlike a full deep sleep.  That was part of the reason he sold his car.  Dr. Shapiro told him to lie down during the day.  The ALJ then asked if Shapiro told him that recently, or whether he told him that 2 or 3 years ago (R271).  Plaintiff testified the doctor told him to do what worked, deciding that was the best approach.  Other than medication that was his regimen because surgery was not recommended (R272).


The medical expert, Dr. Oberlander, was then called to testify (R272).  He opined the record suggested impairments under listing 12.04 for affective depressive disorder, secondary to non-psychiatric pain issues, and spinal stenosis.  The major depressive disorder was an independent one, although secondary to pain issues.  Subsections A, C, E and G of 12.04 were implicated.  A mental residual functional capacity assessment (R248) reflected the treating source opined GAF (Global Assessment of Functioning) was 45 (R275).  The ME noted the psychiatric source emphasized major depression was very much intertwined with physical pain issues and that there was a covariance between the depressive disorder and extent of physical concerns.  When pain issues improved somewhat, so did the depression.  The period in question

–3–

was October 29, 2004 to the present but 80 was the only GAF score noted in the treatment notes. He opined the depressive disorder was very much a parcel of the pain issues so he decided to address the B criteria distinct from the pain issues completely, only basing it on psychiatric issues (R276). Because Plaintiff's professional achievements were quite significant, representing a high level of scientific endeavor, depression was reactive to loss of capacity to perform his previous work. Based on that, he opined the affective disorder led to a functional limitations of moderate restriction of activities of daily living and social functioning. He otherwise opined, on psychiatric grounds only, difficulties in maintaining concentration, persistence or pace were marked, predicated on treating source information (R277). The ALJ interjected noting that was not consistent with Plaintiff's testimony at the last hearing, when he stated he would read novels all the time, which was not indicative of a person with marked limitation in concentration. The ME responded he was not present at the last hearing. The ALJ then asked whether Plaintiff's testimony that day impressed him as a person with marked limitations in concentration, he responded he did not believe so but, before he could finish answering, the ALJ (R278) interrupted, stating what the ME was telling her was what the Plaintiff's doctor said, whereas she wanted his opinion based on the evidence as a whole. The ALJ observed the treating doctor stated deficiencies of concentration were absent but when the ME began to refer to the following page the ALJ, interjecting again, stated the treating doctor indicated it was absent on the front page. When the ALJ noted the marked restriction was not in concentration but in terms of ability to accept instructions and respond appropriately to criticism, the ME stated he must have misread it, so he was given time to review the document again. After review he testified the doctors opinion was somewhat inconsistent because deficiencies of

–4–

concentration were absent on the first page, but on page 2 moderate impairments in the capacity

to remember locations, work like procedures, and in the capacity to understand and remember

detailed instructions, with moderate limitations in ability to maintain attention and concentration

for extended periods of time, were indicated (R279).  Consequently, the ME opined, after having

looked at the notes again, that the B criteria functional limitation in that area would be moderate

also.  When the ALJ noted the treating doctor opined repeated episodes of deterioration or

decompensation were present, the ME testified he did not believe the treating source understood

the Social Security definition of that term.  In his opinion there was no evidence of repeated

episodes of deterioration or decompensation, as defined by Social Security (R280), because an

individual who is capable of engaging in independent travel abroad for a period of 3 months did

not fit the criteria.  When asked whether Plaintiff would be capable performing a simple,

unskilled job on a full time basis, he opined that, strictly on psychiatric grounds, the individual

did indeed retain that capacity.  He believed cognitive functioning remained relatively unaffected

and that the capacity to remember and understand more than simple instructions was retained.

Thus no allowance needed to be made for extent of interaction with coworkers or supervisors

and there was nothing in the record to suggest any limitations interacting with the general public.

 Complex work activity would be precluded because of pain medications.  Thus ME opined the

ability to perform simple, detailed tasks remained (R281).


        When asked on cross examination what percentage a "moderate limitation" presumed,

the ME indicated he did not know the criteria the treating source used.  The ME opined

"moderate" (R281) meant the impairment occurred with some frequency, but certainly did not

preclude that functional capacity.  When asked to clarify what "some" entailed, it meant anywhere between 0 and 20% of the time.  Regarding his testimony there was no evidence of decompensation, or periods of decompensation, the ME replied periods of decompensation or deterioration, as defined by SSA law, indicated a level of functioning where independence has been affected and the individual can no longer function autonomously but required supportive environment, such as a nursing home.  When asked what effect crying spells would have, they were one of the symptoms of an affective disorder.  There was no way to quantity how many spells would be required in a week to be significant but that would not be an integral part of defining decompensation in any event.  He clarified those 2 things were not congruent.  The reference to a GAF score of 80 was what the treating source felt was the level of adaptation prior to onset of spinal stenosis.  Global assessment of functioning was 45 on August 9, 2005.  He admitted Exhibit 11-F was referring to March 2007.  There was some vascillation in symptom severity psychiatrically because at times the treating source, Dr. Notanka, noted improvement (R283), other times exacerbation.  He had no way of knowing whether it was a summary over the entire period or a reference to the date that particular form was completed.  He admitted different people have different side effects from medications and some people were affected more, some less.  When asked whether patients would tell him, for instance, that they read a novel and, when asked about it, had not understood it, he was not sure it was possible hypothetically.  He was not going to give a course in psychiatric terminology by defining major depression (R285).  Counsel then indicated he was trying to draw a distinction between what the treating doctor stated, what the ME started to say, and then what the ME ended up saying.  He admitted diagnosis was major depression (R286).  Regarding any distinction between moderate

depression and diagnosis of major depression, major depression was one of the diagnostic categories defined in the Diagnostic and Statistical Manual of the American Psychiatric Association. It could vary in intensity from a single episode, to recurrent, or could be in remission. The treating source on August 9, 2005 indicated it was a major affective disorder of moderate intensity and that other stressors were moderate to severe, but the ME was unable to understand the opinion at Axis IV because the treater simply summarized the level of stresses being moderate to severe, not specifying the particular stressors. It was clarified the ME opined major depression was of moderate intensity (R287).

In response to questions posed by the ALJ, the vocational expert opined the database administrator job was sedentary and skilled, and the lab tech job light and skilled (R288). The first hypothetical posed (R289) was of an individual 42 years old; with the same work experience and education of Plaintiff; able to sit for 6 to 8 hours out of the day, stand and walk up to 2 hours out of the day; lift and carry 10 pounds frequently and occasionally; who required the opportunity to sit and stand every 30 to 45 minutes; could only occasionally stoop, crawl, crouch, kneel and climb ladders and ramps but never climb ladders, ropes and scaffolds; limited to jobs requiring simple, detailed tasks only, but no complex jobs. The VE opined such a person could not perform Plaintiff's past work. He otherwise opined other jobs existed in the area consistent with the hypothetical including 3,700 mail clerk positions; 3,100 security guards; 2,700 receptionists and 5,800 general office clerks. When another limitation was added whereby the person could only do simple, unskilled work, not even detailed, with no regular general public contact and limited interaction with coworkers and supervisors, jobs cited would still be available but the receptionist position (R290) would be eliminated. There were also 1,000

courier positions available within the bounds of the hypothetical.  These did not conflict with the DOT.

On cross examination (R291) the VE testified the DOT code for general office clerk was 237.367-046; for receptionist 237.367-014; for mail clerk 209.687-026 and for security guard 205.362-022 but he did not have the number for the courier job.  The number of jobs were derived from a publication called Occupational Employment Quarterly.  When asked whether they were the same number of jobs from the publication or whether he reduced them, he stated the courier job was slightly reduced over the sedentary level but was consistent with the judge's hypothetical.  The exact number of jobs was indicated in the fourth quarter publication. When asked whether those jobs would be available if the person needed to lie down during the day without notice, the VE said it had always been his consistent testimony that lying down is generally not allowed unless on normal break times.  If the need for lying down was unpredictable, it would require some sort of special accommodation not normally done in the workplace.  If the person needed to lay down on an unpredictable basis, they could not do any of the jobs.  When counsel began to pose hypotheticals using the term "moderate" (R294) the ALJ interposed, indicating percentages would be acceptable.  The first  hypothetical restricted ability to remember location and work like procedures, to understand and remember detailed instructions and to carry out detailed instructions 20% of the time and the VE testified that if a person had a 20% reduction in the ability to remember activities and what they are supposed to do, they would be severely challenged in terms of being able to maintain employment.  If they were only 80% plugged (R295) into what is required, they would not be able to maintain

employment, even without a 20% reduction in the other aspects included in the hypothetical, because inability to remember activities and what they are supposed to do would render them unable to work.  Regarding ability to accept instructions and respond appropriately to criticism from a supervisor, a person needed to be able to understand and act upon things 90 to 95 percent of the time and any downward deviation from that point made it a difficult situation.  The VE agreed with the conclusion that a person markedly impaired from accepting instructions and responding appropriately to criticism was not employable.(296).  The hearing was then closed.

**ISSUES**

Whether the decision of the Administrative Law Judge is supported by substantial evidence and contains errors of law.

**MEDICAL EVIDENCE AND ARGUMENT**

The ALJ made an error of law at the third step of the sequential evaluation process per 20 CFR Section 404.1520 (d) because she did not comply with SSR 96-5P in evaluating the opinions of the treating physician and psychiatrist, doctors Shapiro and Notanka.  If indeed there opinions were given controlling weight, they reflect not only marked impairment in the ability to accept instructions and respond appropriately to criticism from supervisors and coworkers, in terms of his mental residual functional capacity, but also positive straight leg testing (R155) spinal stenosis (R148) and chronic pain syndrome (R158) implicating Sections 1.04 of the listings for diagnosis of lumbar radiculopathy (R156), as reflected by the opinion of the treating physician, Dr. Shapiro, who opined he needed bed rest at various times throughout the day (R184).  This error of law and its additional implications will also be assessed in this brief with respect to other issues as well.

–9–

The ALJ's credibility analysis reflects an error of law per SSR 96-7P.  Although she properly concluded Plaintiff's medically determinable impairments could reasonably be expected to produce some of the alleged symptoms, per the first criteria of rule, she made an error of law by not assessing his credibility pursuant to the second step required for that analysis as she found his subjective symptoms were not entirely credible.  However, the ALJ succumbed to the temptation to play doctor in her analysis because of her conclusion Plaintiff has not received the type of medical treatment one would expect for a totally disabled individual and that his care has been essentially routine and/or conservative in nature (R27).  This does not comport with the second step of the analysis mandated by SSR 96-7P because an ALJ may not make independent medical findings.  See Blakes v. Barnhart 331 F. 3rd 565 (7th circ. 2003).  It is also contradictory because the decision reflects Plaintiff failed to follow up on recommendations by Dr. Shapiro and did not see other specialists or have any additional (R27)  treatment (even though he saw a neurologist and underwent physical therapy) and, therefore, was not truly motivated to treat his condition, instead seeking to generate evidence in favor of his application for disability.  If indeed one fails to follow recommendations for treatment and does not seek additional treatment, how does this demonstrate a motive to generate evidence?  Because Plaintiff looked for jobs where he could work from home and was no longer looking because he gave up ( R262-263) the ALJ also concluded inability to obtain work, as opposed to inability to perform work, was the motive behind the current application and appeal (R27).  This conclusion assumes jobs are available in significant numbers, that could be done at home, which is not supported by any evidence of record, particularly any testimony from the vocational expert.  There is likewise nothing in the record to suggest Plaintiff's course of treatment was not consistent with what one

would expect for a totally disabled individual, including the testimony of the medical expert, Dr. Oberlander.  Consideration of such notions is contrary to 96-7P and constitute an error of law. Because the ALJ's conclusion Plaintiff's course of treatment is not compatible with disability rests on objective factors that are clearly inappropriate, her credibility determination is patently wrong and subject to review on appeal.  See <u>Cichon v. Barnhart</u> 222 F. Supp. 2d 1019 at 1026 (N.D. Ill. 2002).

Also intertwined with the issues of pain and credibility an error of law was also made in weighing of the medical opinions in this case by failure to comply with SSR 96-5P.  The ME's opinion in particular was taken out of context because it was specifically predicated on the fact that his limited analysis (R276) was made "strictly on psychological grounds" and the loss of self esteem secondary to Plaintiff's previously high level of functioning in contrast to his current situation.  Thus the ME's opinion reflects only one element in  a bifurcation of the psychological issues from the pain/physical issues.  Although the treating psychiatrist opined Plaintiff suffered from marked limitations in accepting instructions and responding appropriately to criticisms from supervisors, the ME testified there was no limitation (R280).  However, the ME's opinion is confined to psychological symptoms, isolated from pain issues.  Because Plaintiff's pain was not considered in conjunction with his ability to function appropriately in the work place, the evidence as a whole was not evaluated within the purview of SSR 96-7P and 96-8P.

The ALJ's mental residual functional capacity assessment further reflects an error of law for failing to follow SSR 96-8P by not making a function by function assessment of Plaintiff's capabilities.  The ALJ found he could perform jobs (R23) with no regular general public contact, limited interactions with coworkers and supervisors, and limited to simple, unskilled tasks.

–11–

Consequently, it cannot be determined on review what functions are actually impaired, only the conclusion that they have resulted in these limitations.

The ALJ reliance on the opinion of the ME, who opined Plaintiff's cognition was relatively unaffected, while at the same time limiting him to simple, detailed work activity (R26) is not supported by substantial evidence. These conclusions are self contradictory in that Plaintiff's functioning pre onset was highly skilled and he has extensive educational background. If indeed his cognition was relatively unaffected, what limits him to simple, detailed work activity? Simple, detailed work activity reflects yet another contradiction because detailed work activity does not suggest simple work. There is likewise nothing in the record, particularly any testimony from the VE, that simple work can also be "detailed." Despite the ME's bifurcation, the opinion of the treating psychiatrist was also taken out of context (R248-250) because although he noted deficiencies of concentration, persistence or pace were absent (R248), the question was only related to deficits resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere). Thus the doctor may not have been aware of problems completing tasks in a timely manner in work settings or elsewhere, since his patient was not even working. Thus his conclusions with respect to moderate impairments in ability to remember work locations and work like procedures, etc. (R249) are not inconsistent with his earlier position. The ALJ also rejected the treating sources opinion because he found there were marked limitations in the ability to accept instructions and respond appropriately to criticism from supervisors (R250), yet the ALJ concluded Plaintiff was only capable of "limited interaction with coworkers and supervisors." However, the extent of the "limitations" was never

defined because no function by function assessment was made per SSR 96-8P.  The rejection of

the treating psychologist's opinion is also contradictory in that she rejected Oberlander's opinion

that Plaintiff required no limits in interaction with the public or coworkers, gave the "greatest

weight possible" to the treating psychiatrist, while at the same time determining Oberlander's

opinion was more consistent with the evidence as a whole.  The only explanation (R26) given by

the ALJ for giving the treating psychiatrist's opinion no weight was because it differed with her

RFC assessment as reflected by the decision and the ME's opinion was more consistent with the

evidence as a whole.  In fact, the treating source also opined there were moderate impairments

(R249) in ability to remember locations and work like procedures; to perform activities within a

schedule, maintain regular attendance, and be punctual with customary tolerances; to sustain

ordinary routine without special supervision; working in coordination and proximity with others

without being distracted by them; and to complete a normal work day and work week without

interruptions from psychologically based symptoms and to perform at a consistent pace without

an unreasonable number and length of rest periods.  There is no explanation why the treating

psychiatrists opinion is not consistent with the evidence generally or how Dr. Oberlander's

opinion could be considered more consistent with the evidence as a whole, given he confined his

opinion to psychiatric issues only and did not consider complaints of chronic pain.  Thus the

rejection on the treating psychiatrists opinion is misplaced because he is not supported by

substantial evidence because reliance in the ME's opinion foreclosed consideration of pain and

its impact.  The ALJ failed to give good reasons for the weight she gave to the treating

psychiatrist's opinion contrary to Cichon v. Barnhart, Supra, at page 1030.

  The rejection of Dr. Shapiro's opinion regarding Plaintiff's physical residual functional

capacity is likewise not supported by substantial evidence and reflects errors of law. First of all, it is predicated on the presumption Shapiro was not familiar with the definition of "disability" contained in the Social Security Act and Regulations (R27). There is no requirement in SSR 96-5P that any treating source necessarily must be familiar with legal definitions. Whether or not Dr. Shapiro was familiar with legal definitions is immaterial in any event because he clearly opined Plaintiff needed to lie down during the course of the day (R184) and that opinion is not predicated upon analysis within any legal framework. Medical opinions are weighed looking at the evidence as a whole per 20 CFR Section 404.1527and SSR 96-5P. The rejection of Shapiro's opinion also reflects the ALJ was playing doctor because she concluded (R27-28) his course of treatment was not consistent with what one would expect if a person were truly disabled. In fact, Shapiro's treatment reflects complaints of back pain that started in 1996 (R24). The acceptance of the ME's testimony that other doctors do not know the legal definition of disability is inappropriate, as he is neither qualified nor authorized to render a legal opinion. Moreover his definition of decompensation, according to the regulations, (R282) is too restrictive. He opined it required documentation of the need for a more structured psychological support system, such as a nursing home, whereas the regulations only mention that as an example. The actual definition includes exacerbations or temporary increases in symptoms or signs, accompanied by a loss of adaptive functioning, as manifested by difficulties in activities of daily living, social relationships and maintaining concentration, persistence or pace. See 20 CFR Section 404, Sub Part P, Appendix 1, Section 12.00 C (4). Thus the ALJ's conclusion there were no episodes of decompensation not only is not supported by substantial evidence but also reflects an error of law. The posing of a leading question to the ME assuming capacity for simple,

–14–

unskilled work, was likewise inappropriate (R280) as the ME is not a vocational expert, is not familiar with the requirements for simple, unskilled work and cannot testify whether or not capacity for those requirements exists.

The ALJ's determination at the fifth step of the sequential evaluation process likewise is not supported by substantial evidence and reflects an error of law.  Not only did the ALJ improperly pose inaccurate hypotheticals, see <u>Steele v. Barnhart</u> 290 F. 3d 936 (7th circ. 2002) because of the rejection of the opinions of Dr. Shapiro regarding his physical limitations and Dr. Notanka regarding his psychiatric impairments, but also because the testimony of the VE conflicts with the DOT.  Although the last hypothetical included limited public contact and limited interaction with coworkers and supervisors (R290) the VE testified the general office clerk job still existed.  The DOT, however, defines the primary duty of that job as answering telephone calls from customers, which hardly limits public contact, per code number 237.367-046.  The mail clerk job cited, with DOT code 209.687-026, is not a sedentary job, as testified to by the VE, but actually a light job per the DOT.  The security guard job, per DOT code 205.362-022, requires specific vocational preparation of 3, which is over 1 month, up to and including 3 months, which by definition is not simple, unskilled work.  See Dictionary Of Occupational Titles (4th Edition 1991).  See also Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, US Department of Labor Employment and Training Administration, 1993, and 20 CFR Section 404, Sub Part P, App. 2, Section 201.00.  Consequently, the decision at the fifth step of the process is not supported by substantial evidence and reflects an error of law because the VE's opinion conflicts with the DOT contrary to SSR 00-4P.  It is also contradictory because the VE opined the same 3 jobs remained in his

answer to the second hypothetical, that were included in his response to the first hypothetical, after "detailed" was eliminated from the simple jobs (R290).  How can these jobs be both simple and detailed?

The ALJ's decision at the fifth step of the sequential evaluation process is not supported by substantial evidence in any event because it ignored the VE's testimony on cross examination that no jobs existed when the 20% limitation was made part of the hypothetical, particularly given the fact the burden of proof shifts to the Commissioner at the fifth step.  See <u>Converse v. Apfel</u> 144 F. Supp 2d 1045 at 1051 (N.D. Ind. 2000).

For the aforementioned reasons this matter should be reversed and the Plaintiff found disabled or, alternatively, remanded for a supplemental hearing to rectify numerous errors in the decision.

Respectfully submitted,

_____

Clyde Ogg
Attorney for Alan Reider

Clyde Ogg
2045 S. Arlington Heights Rd., Ste. 118
Arlington Heights, IL 60005
847/593-2345