**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ALAN REIDER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 07 C 7271** |
| | ) | |
| **v.** | ) | **Magistrate Judge Susan E. Cox** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner of** | ) | |
| **Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Alan Reider seeks judicial review of a final decision denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.[1] The parties have filed Cross-Motions for Summary Judgment; plaintiff seeks a judgment reversing or remanding the Commissioner's final decision, while the Commissioner seeks a judgment affirming his decision. For the reasons set forth below, plaintiff's motion is denied and defendant's motion is granted.

PROCEDURAL HISTORY

On March 22, 2005, plaintiff filed an application for DIB and a period of disability beginning on October 29, 2004.[2] He alleged that severe lower back pain limited his ability to work by preventing him from concentrating or sitting for more than thirty minutes at a time.[3] Plaintiff's claim was denied on June 17, 2005.[4] Plaintiff then filed a request for reconsideration on June 24, 2005,

---

[1] 42 U.S.C. § 405(g).

[2] R. at 109.

[3] R. at 100.

[4] R. at 77.

1

which was denied on July 29, 2005.[5] On August 22, 2005, plaintiff requested a hearing before an Administrative Law Judge ("ALJ").[6] Plaintiff's request was granted and a hearing took place before ALJ Cynthia Bretthauer on September 13, 2006.[7] Following the hearing, the ALJ issued an unfavorable decision, finding plaintiff not disabled at any time from October 29, 2004 through the date of the decision, September 29, 2006.[8] Plaintiff then filed a request for review of the ALJ's decision with the Social Security Administration Appeals Council ("Appeals Council") on November 9, 2006.[9] The Appeals Council granted plaintiff's request and remanded the case to the ALJ on February 8, 2007.[10] Plaintiff received a second hearing before ALJ Bretthauer, which took place on June 5, 2007.[11] On June 29, 2007, the ALJ issued a second unfavorable decision, finding plaintiff not disabled at any time from October 29, 2004 through that date.[12] Plaintiff again filed a request for review of the ALJ's decision, which was denied by the Appeals Council on November 2, 2007. The ALJ's June 29 decision thus stands as the final decision of the Commissioner.[13] Plaintiff filed this action on December 28, 2007.

## STATEMENT OF FACTS

**A.    Introduction and Medical Evidence**

The facts set forth under this subsection provide a brief review of plaintiff's background and the events which led to his application for DIB and a period of disability. They are derived from the

---

[5] R. at 78, 76.

[6] R. at 75.

[7] R. at 49-52.

[8] R. at 189-95.

[9] R. at 198.

[10] R. at 215-17.

[11] R. at 30-33.

[12] R. at 20-29.

[13] R. at 6.

medical record, which the ALJ reviewed at both hearings and considered in its entirety when rendering both of her decisions.

Plaintiff was born on November 2, 1964, making him forty-two years old on the date the ALJ issued her final decision.[14] He completed high school, received a degree from a four-year college and undertook special job training in software development.[15] Between February 1990 and October 2004, he held seven different jobs as either a lab technician or a database administrator.[16] On his first Disability Report dated March 15, 2005, plaintiff indicated that he first began experiencing severe lower back pain in 1995.[17] Though he was able to continue working for the next nine years, plaintiff alleged that his back pain prevented him from being able to work as of October 29, 2004 because it limited his ability to concentrate or sit for more than thirty minutes at a time.[18]

On September 15, 2004, plaintiff went to North Shore PET/CT MRI Centre in Skokie, Illinois for a magnetic resonance image ("MRI") of his lumbar spine.[19] The MRI indicated disk bulges at the L4-5 and L5-S1 levels, causing mild-to-moderate central stenoses and mild biforaminal stenoses.[20] Plaintiff's treating physician, Yuri Shapiro, M.D., discussed the MRI results and provided an overview of plaintiff's back problems in an April 22, 2005 dictation report made one week after plaintiff was examined by Dr. Shapiro.[21] In the report, Dr. Shapiro indicated that he first examined plaintiff on March 5, 1998. Though plaintiff reportedly experienced low back pain radiating to the

---

[14] R. at 98D.

[15] R. at 106.

[16] R. at 115.

[17] R. at 100.

[18] *Id.*

[19] R. at 148-49.

[20] *Id.* "Stenosis" as used here indicates a narrowing of the spine. *See Stedman's Medical Dictionary* 385090 (27th ed. 2000).

[21] R. at 155-56.

right buttock since November 1996, his pain worsened in the months prior to the April 2005 visit. Treatment with Voltaren resulted only in mild improvement. Plaintiff's physical examination during the April 2005 visit was also significant for positive straight leg syndrome on the left side.[22]

Dr. Shapiro then discussed the September 2004 MRI. He confirmed the finding of stenosis and reported that plaintiff had received multiple courses of physical therapy as well as epidural steroid injections, all without significant improvement.[23] He further opined that plaintiff was only able to sit for one hour before being required to rest in bed for two hours to alleviate pain, and was thus unable to work.[24] The findings of stenosis and inability to sit for more than one hour were subsequently confirmed in a May 17, 2005 examination report by a Dr. Simkina,[25] who also made a diagnosis of chronic pain syndrome.[26] Two months later, Dr. Shapiro reiterated his belief that plaintiff was unable to work in a second dictation report. He also reported that a neurologist, Dr. Simpkins,[27] had completed a nerve conduction study of plaintiff's lower extremities and concluded that plaintiff was unable to sit for more than one hour.[28]

However, other evidence challenges Dr. Shapiro's findings regarding the severity of plaintiff's physical limitations resulting from his back problems. A May 24, 2005 Residual Functional Capacity Assessment ("RFCA") by state agency physician Charles Kenney, M.D. concluded that despite plaintiff's spinal stenosis, he could still lift or carry twenty pounds occasionally and ten pounds

---

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] Dr. Simkina's first name is not provided anywhere in the record.

[26] R. at 157-59.

[27] Dr. Simpkins' first name is also not provided anywhere in the record. It is likely that Dr. Simkina and Dr. Simpkins are the same person, given that both apparently made the same finding regarding plaintiff's inability to sit for longer than one hour.

[28] R. at 153.

4

frequently, push or pull with no additional difficulties, stand for at least two hours and sit for about six hours in an eight-hour workday.[29] Dr. Kenney's findings were later affirmed by another state agency physician, Boyd McCracken, M.D., in July 2005.[30] Further, the results of a Physical Work Performance Evaluation ("PWPE") conducted by physical therapist Susan Hardin on June 7, 2005 indicated that while plaintiff was unable to work at the medium exertional level, he was likely to tolerate an eight-hour workday at the light exertional level.[31] Ms. Hardin also noted that plaintiff's self-limiting behavior, which resulted from increasing pain and fatigue and fear of high levels of pain following the test, reduced his participation level by 50% and heavily influenced the results of the PWPE.[32]

On August 9, 2005, plaintiff was examined by Victor E. Nutenko, M.D., a psychiatrist.[33] At the examination, plaintiff complained of insomnia, weight loss of approximately thirty pounds and feelings of depression. Dr. Nutenko noted that plaintiff's medical history included anxiety, depression, spinal stenosis, lumbar disk disease, cardiac arrhythmia and chemical dependence.[34] He diagnosed plaintiff with a major depressive disorder and prescribed Zoloft.[35]

Dr. Nutenko's progress notes detailing plaintiff's depression treatment indicated fluctuation in plaintiff's condition over the eighteen months following the initial August 2005 examination. Only minimal improvement was indicated by Dr. Nutenko in his notes dated October 2005, but by December

---

[29] R. at 161.
[30] R. at 182.
[31] R. at 171.
[32] *Id.*
[33] R. at 211-14.
[34] R. at 211.
[35] R. at 214.

2005 his notes indicated that plaintiff was better, in general, on Zoloft.[36] While his notes from January

2006 indicated no apparent improvement, those from March and May of 2006 indicated less

preoccupation with negative thoughts.[37] The notes from January 2007 indicated less negativity,

depression and pessimism, while those from February 2007 reported that plaintiff's condition had

worsened due to increased depression and apathy.[38] On a Social Security Medical Questionnaire dated

March 7, 2007, Dr. Nutenko indicated that plaintiff suffered from moderate restrictions with regard to

daily living, social functioning and a variety of mental activities; a marked ability to accept instructions

and respond appropriately to criticism; and repeated episodes of deterioration or decompensation in

work or work-like settings.[39]

## B.   The September 13, 2006 Hearing

Plaintiff's first hearing before the Social Security Administration took place on September 13,

2006 in Evanston, Illinois. Plaintiff appeared in person and was represented by his attorney at the time,

Neil Good. A vocational expert ("VE"), Lee Knutson, testified as well.[40] At the hearing, plaintiff

responded to questions from the ALJ. He first discussed his educational background and work history,

noting that he has no pension and has had no income since he stopped receiving disability from his last

employer in 2005.[41] When asked by the ALJ to explain why he refused to continue working at his most

recent job, plaintiff disputed the ALJ's characterization of the circumstances of his unemployment,

saying that he could not work because his previous employer was unwilling to hire him given his need

---

[36] R. at 209-10.
[37] R. at 205-07.
[38] R. at 239.
[39] R. at 248-50.
[40] R. at 300.
[41] R. at 303-05.

for bed rest.[42] He also disputed the results of the June 2005 PWPE, claiming that he was in such pain that he had to interrupt the evaluation.[43] He also stated that his physical therapy sessions failed to lead to any improvement in his condition.[44] When asked by the ALJ about his depression, plaintiff reported experiencing occasional crying spells, though he thought they were not severe.[45] He then answered questions about his exercise routine, which consisted of stomach exercises, ten- or fifteen-minute stationary bike rides and twenty minute walks each day.[46] When asked by the ALJ about his hobbies, plaintiff said he enjoyed reading novels and Popular Science frequently to keep his mind occupied.[47]

The ALJ then asked plaintiff about his travel habits. Plaintiff said that he didn't leave town or go out to the movies or to restaurants other than for fast food.[48] However, he said that he took a two-week vacation to Mexico in the winter of 2005, during which he swam in salt water to ease his back pains.[49] Finally, plaintiff's attorney briefly questioned plaintiff and elicited responses about his origins in Russia, his education, the severity of his pain and his need to rest for two hours for each hour of activity.[50]

The VE, Mr. Knutson, testified next. He first categorized plaintiff's prior database administrator position as a skilled and sedentary job under the Department of Labor's Dictionary of Occupational Titles ("DOT").[51] The ALJ then asked the VE whether a person with plaintiff's work experience and

---

[42] R. at 305-06.
[43] R. at 306.
[44] R. at 309.
[45] R. at 312.
[46] R. at 316.
[47] *Id.*
[48] R. at 317.
[49] *Id.*
[50] R. at 318-21.
[51] R. at 322.

education and certain exertional limitations would still be able to perform plaintiff's past work.[52] The exertional limitations given by the ALJ consisted of the ability to sit for six to eight hours per day; to stand and walk for about six hours per day; to lift and carry up to ten pounds frequently and up to twenty pounds occasionally; and to occasionally stoop, crawl, crouch, kneel and climb stairs and ramps, but not to climb ladders, ropes or scaffolds. The VE said such a person could perform the database administrator position, but not the lab technician position because that job was categorized in the light exertional level.[53] Though the VE testified that a person who had to lie down during the day could not hold the database administrator job, he said such a person would still be employable if he or she only had to sit and stand occasionally.[54]

## C.    The ALJ's September 29, 2006 Decision

In her decision dated September 29, 2006, the ALJ ruled that plaintiff was not disabled and thus was not entitled to DIB or a period of disability.[55] The ALJ's decision followed the five-step sequential evaluation process outlined in 20 C.F.R. § 404.1520(a). Before beginning the five-step process, the ALJ determined that plaintiff met the insured status requirements of sections 216(I) and 223 of the Social Security Act,[56] meaning that he acquired sufficient quarters of coverage to remain insured through December 31, 2009.[57] At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since October 29, 2004 as defined in 20 C.F.R. § 404.1520(b).[58] The ALJ then found at step two that plaintiff had a combination of impairments qualifying as severe under the Social Security

---

[52] R. at 323.

[53] *Id.*

[54] R. at 323-24.

[55] R. at 189-95.

[56] 42 U.S.C. §§ 416(I), 423.

[57] R. at 189.

[58] R. at 191.

Regulations which included lumbar spine stenosis with bulging and adjustment disorder.[59]

Though she found that plaintiff suffered from severe impairments, the ALJ concluded at step three that plaintiff's impairments did not meet or medically equal any of the listed impairments in Title 20 of the Code of Federal Regulations, Part 404, Subpart P, Appendix 1 because plaintiff's back impairment was not accompanied by the neurological deficits required by section 1.04(A) of the Listing of Impairments, or the inability to ambulate effectively required by sections 1.02(A) and 14.09.[60] With regard to plaintiff's mental condition, the ALJ found that the evidence only established functional limitations under the "B" criteria under section 12.04.

Next, the ALJ determined plaintiff's residual functional capacity ("RFC").[61] A claimant's RFC represents what they can still do despite their limitations.[62] Considering the entire record, the ALJ found that plaintiff had the RFC to lift or carry ten pounds; alternate between sitting and standing every thirty to forty-five minutes; occasionally stoop, crawl, crouch, kneel and climb stairs or ramps; and perform activities that do not require climbing ladders, ropes and scaffolds.[63] This conclusion was at odds with plaintiff's claim (as well as treating physicians' opinions) that plaintiff's pain precluded him from concentrating, lifting ten pounds or sitting for more than thirty minutes without needing to lie down.[64] The ALJ found that while plaintiff's impairments could reasonably be expected to produce the symptoms he alleged, his statements about the intensity, persistence and limiting effects of his symptoms were not entirely credible.[65] In support of this finding, the ALJ noted that plaintiff's June 2005 PWPE indicated he

---

[59] Id.

[60] R. at 192.

[61] R. at 191.

[62] 20 C.F.R. § 404.1545(a)(1).

[63] R. at 192.

[64] Id.

[65] R. at 194.

was capable of light work, and that plaintiff's primary care physician and a neurologist both opined that plaintiff was capable of sit/stand work.[66] In giving less weight to the treating physicians' opinions, the ALJ noted that plaintiff's course of treatment as indicated in the medical evidence was not consistent with what a truly disabled individual would receive.[67] Accordingly, she concluded that there was nothing in the record to substantiate a further reduction in plaintiff's RFC.[68]

Finally, having established plaintiff's RFC, the ALJ proceeded to step four and relied on the VE's testimony at the September 13 hearing and found that plaintiff was capable of performing his past relevant work as a database administrator because that work was classified as skilled and sedentary, and accordingly within plaintiff's abilities.[69] As a result, given that she found plaintiff was able to work, the ALJ concluded that he was not disabled under sections 216(I) and 223(d) of the Social Security Act.

### D.    The June 5, 2007 Hearing

On February 8, 2007, the Appeals Council granted plaintiff's request for review of the ALJ's September 29, 2006 decision and remanded for further evaluation of plaintiff's mental impairment and a more detailed explanation of the ALJ's credibility findings.[70] Accordingly, a second hearing took place before ALJ Bretthauer on June 5, 2007. Plaintiff again testified, as did medical expert ("ME") Mark Oberlander, M.D. and VE James Radke.[71]

During his testimony, plaintiff said that his physical condition was about the same as it was at the time of the first hearing.[72] When asked by the ALJ whether he could perform any of his past skilled work

---

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] R. at 194-95.

[70] R. at 217.

[71] R. at 257.

[72] R. at 261.

or other work requiring less skill, plaintiff reiterated that he was unable to work given his need for bed rest and his difficulty concentrating.[73] He also testified that his last check-up with Dr. Shapiro was three months prior to the hearing and that he had not seen any specialists or received any other treatment since then.[74] Regarding his psychiatric treatment, plaintiff said that he was seeing Dr. Nutenko about once per month and that his depression had gotten worse since the previous hearing, though it improved after he switched from Zoloft to Wellbutrin.[75] The ALJ also asked plaintiff about his activity level. Plaintiff testified that he was unable to sit for longer than twenty or thirty minutes or stand for more than two minutes without suffering severe pain.[76] Plaintiff also said that he read and exercised less often and spent more of his time watching TV than he did at the time of the previous hearing.[77]

Finally, the ALJ asked plaintiff about his travel activities since the previous hearing. Plaintiff answered that he spent three months in Asia for financial reasons beginning in November 2006.[78] The ALJ asked why he went and how he was able to sit through a long flight; plaintiff responded that he made the trip because his personal expenses, including living costs and physical therapy, were much lower in Asia.[79] He also stated that he needed to take two Vicodins in order to tolerate the long flight.[80] The ALJ replied that she couldn't understand why plaintiff could go to Asia, but couldn't go someplace in the neighborhood.[81]

The ME, Dr. Oberlander, then testified. He reported that plaintiff suffered from a major depressive

---

[73] R. at 261-62.

[74] R. at 263.

[75] R. at 264-65.

[76] R. at 267.

[77] R. at 268.

[78] R. at 269-70.

[79] *Id.*

[80] *Id.*

[81] *Id.*

disorder secondary to his non-psychiatric pain issues.[82] He then opined that, based on the treating source's indications, plaintiff suffered from marked difficulties in maintaining concentration, persistence or pace.[83] The ALJ asked the ME whether plaintiff's testimony and the evidence as a whole led him to view plaintiff as someone with marked limitations in concentration; the ME responded that he didn't believe so.[84] The ALJ referenced Dr. Nutenko's March 7, 2007 questionnaire, which indicated that deficiencies of concentration were absent.[85] After reviewing the questionnaire, the ME said he misread it and agreed that plaintiff's limitations in ability to maintain attention and concentration were moderate, not marked, and thus belonged in the "B" criteria rather than the "C" criteria.[86] He also opined that based on plaintiff's testimony, episodes of deterioration or decompensation as defined by the Social Security regulations were not present because such episodes indicate a level of functioning requiring a supportive environment such as a nursing home, and an individual capable of traveling abroad for three months clearly did not require such care.[87] Further, the ME stated that Dr. Nutenko likely did not understand the definition of "episodes of deterioration or decompensation" used in the Social Security regulations when he indicated the presence of these symptoms on the March 2007 questionnaire.[88] Finally, the ME opined that plaintiff's cognitive functioning was relatively unaffected and, as a result, plaintiff was still capable of engaging in simple and detailed work activity without any limits on his interaction with coworkers, supervisors, or the general public.[89]

---

[82] R. at 274.

[83] R. at 277.

[84] *Id.*

[85] R. at 278, 248.

[86] R. at 278-79.

[87] R. at 280, 282.

[88] R. at 279.

[89] R. at 280-81.

The VE, Mr. Radke, then testified. As she did during the first hearing, the ALJ asked the VE whether a person with plaintiff's work experience, education and certain exertional limitations could perform plaintiff's past relevant work.[90] The exertional limitations given by the ALJ were more severe than those which she provided to the VE at the first hearing: she described a person plaintiff's age and with his work experience and education who could sit for six to eight hours out of the day; could stand and walk up to two hours out of the day; could lift and carry frequently and occasionally only ten pounds; could not work without having an opportunity to sit and stand every thirty to forty-five minutes; could only occasionally stoop, crawl, crouch, kneel and climb stairs and ramps; could never climb any ladders, ropes and scaffolds; and was limited to jobs that are simple and detailed.[91] The VE testified that such a person would be incapable of performing plaintiff's past work, but that there were 16,300 mail clerk, security guard, receptionist, office clerk and courier positions in the northeastern Illinois area that such a person could perform.[92] The ALJ then posed a second hypothetical by adding the requirement that the person could only perform simple, unskilled work and could have no regular public contact and only limited interaction with coworkers and supervisors. The VE testified that all of the jobs would still be available except for the receptionist positions.[93] The ALJ then asked the VE whether the evidence he provided conflicted at all with the DOT; he answered that it did not.[94]

Plaintiff's attorney, Mr. Good, then cross-examined the VE. He asked for the source of the job figures testified to by the VE and requested the DOT codes for each of the jobs.[95] The VE replied that the

---

[90] R. at 288-89.

[91] R. at 289.

[92] R. at 289-90.

[93] *Id.*

[94] R. at 290-91.

[95] R at 291.

job figures came from a publication called Occupational Employment Quarterly and provided a code for each of the jobs except for the courier position. Mr. Good then proceeded to ask a series of hypothetical questions to determine the extent to which moderate mental impairments would limit a claimant's ability to work, defining "moderate" as a twenty percent reduction in capability under a given category of activity.[96] The VE testified that a person with a twenty percent reduction in ability to remember activities would likely be unemployable.[97]

### E.    The ALJ's June 29, 2007 Decision

In her decision dated June 29, 2007, the ALJ again ruled that plaintiff was not disabled and, thus, was not entitled to DIB or a period of disability. The ALJ's analysis with regard to the insured status requirement, plaintiff's lack of substantial gainful activity, and his severe impairments was identical to the analysis in the September 2006 decision.[98] Similarly, she again found under step three that plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in the Social Security regulations because he did not have the neurological deficits required by section 1.04A or an inability to ambulate effectively.[99] In support of her finding at step three, the ALJ also relied on the ME's testimony that no "C" criteria were met and that Dr. Nutenko's responses to the March 2007 questionnaire were at odds with definitions in the Social Security regulations.[100]

The ALJ then turned to the RFC analysis, considering all of plaintiff's symptoms and the extent to which they could be reasonably accepted as consistent with the evidence.[101] She found that plaintiff had

---

[96] R. at 294-96.

[97] R. at 295.

[98] R. at 22, 191.

[99] R. at 22.

[100] R. at 23.

[101] *Id.*

the RFC described in her second hypothetical at the June 5 hearing, including the limitations regarding simple, unskilled work, no regular public contact and limited interaction with co-workers and supervisors.[102] However, while the ALJ's review of the medical evidence led her to find that plaintiff's impairments could reasonably be expected to produce the symptoms he alleged, she again concluded that his statements concerning the intensity, persistence and limiting effects of the symptoms were not entirely credible.[103] The ALJ supported this finding by noting that plaintiff's claims regarding the limited scope of his daily activities could not be objectively verified and found little support in the "relatively weak medical evidence."[104] Further, the ALJ noted that despite his professed limitations, plaintiff was still able to take two lengthy vacations, including a three month trip to Asia, which tended to suggest that his alleged symptoms and limitations may have been overstated.[105] Finally, the ALJ noted that plaintiff's medical care had been essentially routine and/or conservative in nature, given his failure to see other specialists or have any additional treatment.[106] Accordingly, the ALJ suggested that plaintiff's inability to obtain work, rather than his inability to perform work, was the motivation behind his application for DIB.[107]

Having determined plaintiff's RFC, the ALJ proceeded to step four to determine whether plaintiff could perform any past relevant work. Because plaintiff's past jobs as a database administrator and lab technician were classified as sedentary/skilled and light/skilled, the ALJ found both to be inconsistent with plaintiff's RFC as described above.[108] As a result, she found that plaintiff was unable to perform any past

---

[102] Id.
[103] R. at 26.
[104] R. at 27.
[105] Id.
[106] Id.
[107] Id.
[108] R. at 28.

15

relevant work.[109]

The ALJ considered whether plaintiff could perform any other work existing in significant numbers in the national economy.[110] The ALJ, relying on the VE's testimony, found that while plaintiff's ability to perform sedentary work was impeded, he was still able to perform the requirements of 13,600 existing jobs in the national economy, a figure which represented the VE's response to the ALJ's second hypothetical.[111] After asserting that the VE's testimony was consistent with the DOT, the ALJ concluded that because plaintiff was capable of performing other work, he was not disabled at any time since October 29, 2004.[112]

STANDARD OF REVIEW

The Court performs a *de novo* review of the ALJ's conclusions of law, but the ALJ's factual determinations are entitled to deference.[113] The Court will uphold the ALJ's decision if it is supported by substantial evidence and is free from legal error.[114] Substantial evidence means "such evidence as a reasonable mind might accept as adequate to support a conclusion."[115] Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a plaintiff is disabled falls upon the Commissioner, not the courts.[116] Even so, the decision of the Commissioner is not entitled to unlimited judicial deference. An ALJ must minimally articulate his reasons for crediting or rejecting evidence of

---

[109] *Id.*

[110] *Id.*

[111] R. at 29.

[112] *Id.*

[113] *Prochaska v. Barnhart*, 454 F.3d 731, 734 (7th Cir. 2006).

[114] 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

[115] *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

[116] *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990) (*quoting Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).

16

disability.[117] The Court will conduct a critical review of the evidence and will not uphold the ALJ's decision if it lacks evidentiary support or an adequate discussion of the issues.[118]

## SOCIAL SECURITY REGULATIONS

The Social Security Regulations prescribe a sequential five-part test for determining whether a claimant is disabled.[119] The ALJ must consider: (1) whether the claimant is presently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy.[120] A finding of disability requires an affirmative answer at either step three or step five, while a negative answer at any step other than step three precludes a finding of disability.[121]

## ANALYSIS

In his brief, plaintiff argues that the ALJ's decision must be reversed or remanded because the ALJ erred by: (1) improperly weighing the opinions of the treating psychiatrist and physicians; (2) improperly "playing doctor" while determining plaintiff's credibility during the RFC evaluation; and (3) relying on the VE's testimony despite the fact that it conflicted with the DOT. The Court will examine each of these arguments in turn.

---

[117] *Clifford*, 227 F.3d at 870 (*quoting Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992)).

[118] *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Clifford*, 227 F.3d at 869, *and Steele*, 290 F.3d at 940).

[119] *See* 20 C.F.R. §§ 404.1520, 416.920.

[120] *Id.*

[121] *Young v. Sec'y of Health and Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

**A.   The ALJ's Weighing of the Treating Physicians' Opinions**

Plaintiff first argues that the ALJ erred at step three of the sequential evaluation because she improperly declined to give controlling weight to the opinions of the treating physician and psychiatrist, Dr. Shapiro and Dr. Nutenko. The Commissioner responds that contrary to plaintiff's claim, the ALJ properly considered both doctors' opinions regarding plaintiff's physical and mental abilities and reasonably concluded that neither was entitled to significant weight given the lack of significant objective findings supporting them.

A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record.[122] If an ALJ chooses not to give a treating physician's opinion controlling weight, they must apply certain factors to determine the weight to be given to the physician's opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the extent to which the opinion is supported by relevant evidence; (4) the extent to which the opinion is consistent with the record as a whole; (5) the treating physician's specialization, if applicable; and (6) other factors, such as the amount of understanding of Social Security disability programs that the treating physician has.[123] An ALJ may discount a physician's medical opinion "as long as he 'minimally articulate[s] his reasons for crediting or rejecting evidence of disability[.]'"[124]

Applying these rules to the present case, the Court finds that the ALJ committed no error in declining to give controlling weight to the opinions of Dr. Shapiro and Dr. Nutenko. With regard to Dr. Shapiro's opinion, the ALJ's opinion clearly articulated her reasons for giving no weight to the portions

---

[122] *Skarbek v. Barnhart,* 390 F.3d 500, 503 (7th Cir. 2004) (*citing Gudgel v. Barnhart,* 345 F.3d 467, 470 (7th Cir. 2003)).

[123] 20 C.F.R. 404.1527(d)(2)-(d)(6).

[124] *Skarbek*, 390 F.3d at 503 (*citing Clifford*, 227 F.3d at 871).

of his testimony which conflicted with her RFC assessment. Further, her reasons were rooted in the factors listed in 20 C.F.R. 404.1527(d)(2)-(d)(6).

First, after discussing plaintiff's failure to follow up and the "routine and/or conservative" nature of plaintiff's treatment, the ALJ found that Dr. Shapiro's course of treatment for plaintiff "has not been consistent with what one would expect if the claimant were truly disabled."[125] In support of this conclusion, she specifically referenced plaintiff's failure to follow up on Dr. Shapiro's treatment recommendations or seek additional treatment.[126] Second, the ALJ found that Dr. Shapiro's opinion regarding plaintiff's disabling limitations was not supported by relevant evidence because his assertion that plaintiff must lie down for one to two hours after sitting was not supported by the medical record or indicated in his own treatment notes.[127] Finally, the ALJ found that Dr. Shapiro's opinion that plaintiff is "disabled" was flawed because it was not clear that he was familiar with the definition of "disability" contained in the Social Security Act and regulations.[128] Each of these lines of reasoning included references to evidence (or lack thereof) in the medical record, and each was rooted in the factors listed in 20 C.F.R. 404.1527(d)(2)-(d)(6). As such, the Court cannot conclude that the ALJ failed to carry her burden of minimally articulating her reasons for discounting Dr. Shapiro's testimony, insofar as it conflicted with her RFC assessment.

With regard to Dr. Nutenko's opinion, it is also clear that the ALJ minimally articulated her reasons for partially discounting portions of his testimony. The ALJ discussed Dr. Nutenko's March 2007 medical questionnaire, which was the only source of his opinion.[129] Consistent with 20 C.F.R.

---

[125] R. at 27-28.

[126] *Id.*

[127] *Id.*

[128] R. at 27.

[129] R. at 26.

404.1527(d)(3), she noted that Dr. Nutenko's assertion that plaintiff had repeated episodes of decompensation in work or work-like settings was not supported in the evidence of record.[130] She also noted that this assertion was inconsistent with the opinion of the ME, Dr. Oberlander, given his testimony that plaintiff suffered no episodes of decompensation as defined by social security law or based on testimony.[131] Further, as she did when weighing Dr. Shapiro's opinion, the ALJ concluded that it was unlikely Dr. Nutenko understood the definition of "decompensation" used in the Social Security regulations, given the inconsistency noted above.[132] For these reasons, the ALJ determined that while Dr. Nutenko's opinion, given "the greatest weight possible," did indicate that some limits on interaction with the public or coworkers may be warranted, they did not justify altering the RFC assessment to conform to Dr. Nutenko's questionnaire responses. Given that the ALJ considered the lack of support for Dr. Nutenko's conclusions, the conflict between those conclusions and other record evidence, and the likelihood that Dr. Nutenko did not understand Social Security's definition of the term "decompensation," the Court finds that the ALJ satisfied her burden of minimally articulating her reasons for partially discounting the opinion of Dr. Nutenko in accordance with 20 C.F.R. 404.1527(d)(2)-(d)(6).

## B.    The ALJ's Credibility Determinations

Plaintiff next argues that the ALJ's determination of plaintiff's credibility was flawed because she "play[ed] doctor" by making independent medical findings and inappropriately premised her conclusions on objective factors, contrary to Social Security Ruling 96-7p. The Commissioner responds that the ALJ properly considered the lack of objective medical evidence to support plaintiff's allegations and reasonably concluded that plaintiff's subjective allegations were not fully credible.

---

[130] *Id* (*citing* R. at 248-50).

[131] R. at 26.

[132] *Id.*

Courts will not disturb an ALJ's credibility findings unless they are patently wrong.[133] Despite this, courts review an ALJ's credibility determination with greater freedom when it rests on objective factors or fundamental implausibilities rather than subjective considerations.[134] Under Social Security Ruling 96-7p, an ALJ's credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." The ALJ may not disregard a claimant's statements about the intensity and persistence of pain or other symptoms solely because they are not substantiated by objective medical evidence.[135] Rather, in making a credibility determination the adjudicator must consider the entire case record, including the claimant's own statements as well as those provided by treating or examining physicians and other persons.[136]

Contrary to plaintiff's claim, the ALJ analyzed plaintiff's credibility in accordance with Social Security Ruling 96-7p by providing specific reasons, supported by relevant medical evidence, for her conclusion that plaintiff's claims were not entirely credible. Plaintiff's claim that the ALJ improperly relied on objective medical evidence is also unfounded because, in making her credibility determination, the ALJ did not use such objective evidence alone, but also considered the claimant's statements as well as those of Dr. Shapiro, and thereby complied with the requirements of Social Security Ruling 96-7p. Accordingly, the Court cannot say that the ALJ's credibility determination was patently wrong and, thus, will not overturn it.

The ALJ's explanation of why she found plaintiff's allegations not fully credible consists of three

---

[133] *Sims v. Barnhart*, 309 F.3d 424, 431 (7th Cir. 2002).

[134] *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).

[135] SSR 96-7p.

[136] *Id.*

paragraphs, each of which lays an independent foundation for her credibility finding.[137] First, the ALJ wrote that plaintiff described limitations in his daily activities which could not be objectively verified and appeared inconsistent with plaintiff's testimony.[138] In particular, the ALJ took issue with plaintiff's testimony that he took two long vacations since his alleged onset of disability date. While she recognized that disability and vacation were not mutually exclusive, she found that plaintiff's ability to travel "tends to suggest the alleged symptoms and limitations may have been overstated."[139]

Next, the ALJ found that plaintiff had "not generally received the type of medical treatment one would expect for a totally disabled individual" given that his care was "routine and/or conservative in nature."[140] In support of this finding, the ALJ referenced three points of evidence: plaintiff's failure to follow up on recommendations made by Dr. Shapiro regarding treatment measures; plaintiff's testimony that he has not seen other specialists or sought any additional treatment since the first hearing; and plaintiff's "inconsistent and unpersuasive" description of his symptoms and limitations.[141]

Finally, the ALJ wrote that the RFC conclusions reached by the state physicians support a finding of "not disabled."[142] The ALJ recognized that non-examining state physicians' opinions do not generally deserve as much weight as those of examining or treating physicians. Nevertheless, she gave these opinions considerable weight because she found that the evidence from Dr. Shapiro's treatment of plaintiff deserved no weight in determining plaintiff's RFC. As noted above, in support of this conclusion the ALJ referenced Dr. Shapiro's likely unfamiliarity with the definition of "disability" used in the Social Security

---

[137] R. at 26-27.

[138] *Id.*

[139] R. at 27.

[140] *Id.*

[141] *Id.*

[142] *Id.*

regulations, which the VE testified to at the June 5 hearing.[143] Further, she also found that Dr. Shapiro's treatment notes did not support plaintiff's disabling limitations, specifically noting that plaintiff's claim that he needed one to two hours of bed rest after sitting was not supported by the medical record or indicated in the treatment notes.[144]

Given the ALJ's reference to specific medical evidence documented in the record in support of her findings, the Court cannot conclude that the ALJ improperly "played doctor" by substituting her own opinion for that of the treating physician. To the contrary, the ALJ reviewed Dr. Shapiro's treatment notes and weighed his opinion against other evidence in the record. She discussed the evidence supporting her conclusion and gave examples of portions of Dr. Shapiro's opinion which she found were unsubstantiated.[145] In doing so, the ALJ fulfilled her duty to minimally articulate her reasons for rejecting evidence of plaintiff's disability.[146] Accordingly, the Court rejects plaintiff's claim that the ALJ's credibility determination was patently wrong.

## C.   The ALJ's Reliance on the VE's Testimony

Finally, plaintiff argues that the ALJ's step five finding violated Social Security Ruling 00-4p because though she asked whether the VE's testimony conflicted with the DOT and received a negative answer, the testimony did in fact conflict with the DOT and, thus, her reliance on it was improper. The Commissioner responds that while three of the jobs identified by the VE may be beyond plaintiff's abilities, 1,000 courier jobs remained which plaintiff could perform, and in any event it was reasonable for the ALJ to rely on the VE's testimony because there was no evidence of a conflict between the VE's

---

[143] *Id.*

[144] *Id.*

[145] *Id.*

[146] *See Clifford*, 227 F.3d at 870.

testimony and the DOT at the time of the June 5 hearing.

When a VE provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that evidence and information provided to the DOT before relying upon that evidence to support a disability determination or decision.[147] This responsibility has two components. First, the adjudicator must ask the VE if the evidence he or she has provided conflicts with the DOT.[148] Second, if the evidence appears to conflict with the DOT, the adjudicator must obtain a reasonable explanation for the apparent conflict.[149]

In the present case, there is no question that the ALJ satisfied the first component of the test outlined in *Prochaska v. Barnhart* given that during the June 5 hearing she directly asked the VE whether the evidence he provided conflicted at all with the DOT.[150] Under the rule from *Prochaska*, then, the question is whether the ALJ had a duty under the second component to make further inquiries in order to obtain a reasonable explanation for any apparent conflicts. While *Prochaska* makes the ALJ's duty under the first component clear, it sheds little light on a judge's role under the second component because the ALJ there did not ask the VE whether his analysis conflicted with the DOT in the first place.[151] Because the ALJ's decision in *Prochaska* was vacated for this reason, that case provides no guidance in determining what the ALJ's additional duties, if any, may have been had he actually made the proper initial inquiry under the first component of the test, as the ALJ in the present case did.

The Seventh Circuit recently addressed this issue in *Stark v. Astrue*.[152] Like plaintiff here, the

---

[147] *Prochaska*, 454 F.3d at 735 (*citing* SSR 00-4p).

[148] *Id.*

[149] *Id.*

[150] R. at 29, 290-91.

[151] *Prochaska*, 454 F.3d at 735.

[152] No. 07-2148, 2008 WL 2066464 (7th Cir. May 16, 2008).

claimant in *Stark* challenged the ALJ's step five finding by arguing that the VE's testimony was not reflective of the DOT and thus was so inadequate that the ALJ's reliance upon it was not based on substantial evidence.[153] The claimant acknowledged that the ALJ "satisfied the first component of [the *Prochaska* test] by asking [the VE] whether his testimony corresponded to DOT definitions."[154] He argued that even though the VE said his testimony was consistent with the DOT, the ALJ had a responsibility to inquire further into specific characteristics of the jobs listed by the VE.[155]

The court rejected plaintiff's argument and stated that the Seventh Circuit *"ha[s] never held that ALJs have any such further requirement*."[156] It also noted that the VE's testimony did not present any apparent conflict with the DOT and, therefore, the ALJ had no reason to doubt his assurances that there were no such conflicts.[157] Further, the court recalled that claimant's attorney did not ask the VE to explain the job requirements in more detail or request that the ALJ keep the record open so that he could cross-check the VE's job descriptions with the DOT.[158] Rather, claimant's attorney only raised the issue of a potential conflict after the hearing.[159] Finally, the court stated that claimant's brief failed to elucidate any conflict between the VE's testimony and the DOT and cited other Seventh Circuit authority stating that an ALJ is permitted to rely on expert testimony even if it contradicts the DOT.[160] Accordingly, the court held that the ALJ committed no error in relying on the VE's testimony.[161]

There are clear parallels between the circumstances in *Stark* and those in the present case. As noted

---

[153] *Id.* at *6.

[154] *Id.*

[155] *Id.*

[156] *Id* (emphasis added).

[157] *Id.*

[158] *Id.*

[159] *Id.*

[160] *Id* (*citing Powers v. Apfel*, 207 F.3d 431, 436-37 (7th Cir. 2000)).

[161] *Id.*

above, the ALJ here asked for, and received, assurance from the VE that his testimony was consistent with the DOT.[162] Further, as in *Stark*, nothing in the cross examination of the VE conducted by plaintiff's attorney raised an apparent conflict between the VE's testimony and the DOT. Though plaintiff's attorney asked the VE for the DOT codes for the jobs he described, he did not ask him to describe the exertional requirements of the jobs in more detail or request that the record be left open so that he could determine whether conflicts existed.[163] Rather, plaintiff failed to raise the possibility of a conflict between the VE's testimony and the DOT until he filed his brief, months after the hearing. As in *Stark*, the absence of an apparent conflict at the time of the June 5 hearing supports a conclusion that the ALJ satisfied her duty when she examined the VE and asked him whether his testimony was consistent with the DOT.

Despite this, plaintiff claims (and defendant's brief concedes) that portions of the VE's testimony may conflict with the DOT. Though this Court concludes that those conflicts which did exist were not apparent at the time of the June 5 hearing, and further finds that such conflicts would not alter the outcome of the decision on remand, we will explore plaintiff's claims nonetheless. The VE's testimony indicated that four jobs were within plaintiff's abilities despite his limitations: mail clerk (3,700 jobs); security guard (3,100 jobs); general office clerk (5,800 jobs); and courier (1,000 jobs).[164] Plaintiff challenges the VE's testimony with regard to each of these jobs.

First, plaintiff argues that the general office clerk testimony was inconsistent with the DOT because though the ALJ's second hypothetical required that no jobs involving "regular general public contact" be considered, the DOT defines the primary duty of the general office clerk as answering telephone calls from customers, which plaintiff claims does not limit public contact.[165] However, the VE's

---

[162] R. at 290-91.
[163] R. at 291-96.
[164] R. at 29.
[165] R. at 289.

testimony indicates that he interpreted the limitation on "public contact" as being confined to face-to-face interactions, given that he eliminated a receptionist position when the ALJ incorporated the limitation into her hypothetical.[166] Because nothing in the record rebuts this interpretation, the Court concludes that the ALJ shared the VE's understanding of the "public contact" limitation when she relied upon his opinion. Given the evidence supporting this understanding, there is no inconsistency between the general office clerk description in the DOT and plaintiff's RFC.

Second, plaintiff argues that the mail clerk testimony was inconsistent with the DOT because the VE testified that the mail clerk position is a sedentary job, while the DOT indicates that it is a light job. However, at no point in the VE's testimony did he state that the mail clerk job was sedentary.[167] Further, the exertional requirements of the mail clerk job as outlined in the DOT do not exceed those outlined in plaintiff's RFC.[168] Therefore, there is no conflict between the DOT and the VE's testimony that plaintiff could perform the mail clerk job.

Third, plaintiff argues in his reply brief that the ALJ inappropriately relied on the VE's testimony regarding the courier job because the VE did not provide a DOT code for the job, making it impossible to check the DOT to determine whether a person with plaintiff's RFC could actually perform the job. Though plaintiff is correct that the VE was unable to produce a DOT code for the courier job, the mere absence of a DOT code cannot be interpreted as affirmative evidence of an inconsistency with the DOT given that it provides no information at all about the job's requirements. Further, plaintiff's attorney did not follow up on this omission with the VE, and failed to raise the issue at all until he filed his reply brief almost a year after the ALJ's decision.[169] This suggests that, as in *Stark*, the VE's testimony simply did

---

[166] R. at 290.

[167] *See* R. at 287-96.

[168] *See Dictionary of Occupational Titles* 209.687-026 (4th ed. rev. 1991); R. at 23.

[169] *See* R. at 291-96.

not present any apparent conflict with the DOT at the time of the June 5 hearing.[170] Because the lack of a DOT code does not, standing alone, signify such a conflict, the ALJ met her burden with respect to the courier position when she asked the VE whether his testimony was consistent with the DOT.

Finally, plaintiff argues that because plaintiff's RFC limits him to unskilled work, he is incapable of performing the duties of the security guard job because it requires specific vocational preparation of one to three months, which exceeds the training requirement for unskilled work. On this point, plaintiff is correct: Social Security Regulations 00-4p and 82-41 make clear that an "unskilled" job requires only 30 days of training or less, and thus the security guard job is by definition not unskilled. However, even accepting that the VE's testimony on this point was inconsistent with the DOT, the error is harmless. A remand based solely on this inconsistency would not alter the outcome of the case, since the Court concludes that there is no basis for a finding that plaintiff could not perform the mail clerk, general office clerk, and courier positions. Further, the Seventh Circuit has held that harmless errors in administrative proceedings do not require remand upon judicial review.[171]

In summary, it is clear from the ruling in *Stark* that, absent any apparent conflicts, Seventh Circuit precedent requires no further ALJ inquiry once a VE assures the ALJ that his or her testimony is consistent with the DOT. Further, in the present case, any inconsistencies between the VE's testimony and the DOT were not apparent during the hearing and are ultimately harmless. Therefore, the Court concludes that the ALJ met her burden under step five of the sequential evaluation process.

CONCLUSION

For the reasons set forth above, the Court finds that the ALJ's June 29, 2007 decision is supported

---

[170] *See Stark*, 2008 WL 2066464, at *6.

[171] *See Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003) (*citing Sahara Coal Co. v. Office of Workers Comp. Programs*, 946 F.2d 554, 558 (7th Cir. 1991)).

by substantial evidence. Accordingly, the Court denies plaintiff's Motion for Summary Judgment [dkt 18]

and grants the Commissioner's Motion for Summary Judgment [dkt 20].

**IT IS SO ORDERED.**



U.S. Magistrate Judge

Susan E. Cox


Date:  July 11, 2008